
IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

STEVEN R. BARELA,

        Petitioner,

vs.

WYOMING DEPARTMENT OF
CORRECTIONS HONOR
CONSERVATION CAMP WARDEN
TODD MARTIN, in his official capacity,

        Respondent,

Case No. 19-CV-0011-NDF

---

## MEMORANDUM OPINION AND ORDER GRANTING IN PART RESPONDENT'S SECOND MOTION FOR SUMMARY JUDGMENT AND DISMISSING PETITION WITHOUT PREJUDICE

---

This matter is before the Court on Respondent Warden Todd Martin's second motion (doc. 25) for summary judgment on Petitioner Steven R. Barela's petition for habeas corpus under 28 U.S.C. § 2241. In the Court's order on the parties' first motions for summary judgment, the Court found material fact disputes precluded summary judgment for either party on Petitioner's equal protection claims. Doc. 16 (Order of August 12, 2019, referred to hereafter as the First Summary Judgment Order). The Court set a schedule for discovery, the parties' expansion of the record, and second motions for summary judgment. Doc. 17 (Order of August 16, 2019). Both parties filed materials to expand the record. Docs. 23, 24. With the Court's leave, Respondent submitted certain unredacted, confidential materials expanding the record on CD under seal. Petitioner has

filed his opposition (doc. 34) to Respondent's second motion for summary judgment, and Respondent's time in which to reply has passed. The motion is therefore ripe. For the reasons that follow, the Court concludes it lacks jurisdiction to hear Petitioner's claims on a habeas petition, and construing the petition as a 42 U.S.C. § 1983 complaint would be futile because based on the expanded record, Petitioner's remaining claims would not survive summary judgment. The Court therefore dismisses the petition without prejudice.

## BACKGROUND

Petitioner seeks relief under 28 U.S.C. § 2241, which provides habeas corpus relief as to the execution of a sentence in certain circumstances. Specifically, Petitioner asserts he is "in custody in violation of the Constitution or laws … of the United States ...." 28 U.S.C. § 2241(c)(3). In the claims that survived the First Summary Judgment Order, Petitioner asserts equal protection violations in disciplinary proceedings held in the Wyoming Department of Corrections' ("DOC") Honor Conservation Camp ("WCC"). Doc. 1. The First Summary Judgment Order recites the undisputed facts at length, and the Court assumes familiarity with that order here.

To summarize Petitioner's contentions, he asserts he was discriminated against on the basis of his Hispanic race and nature of his conviction (non-sex offender) in two disciplinary proceedings at WCC. The first proceeding arose from conduct in Petitioner's participation in the Camp's dog program known as "L.O.V.E.D.," the Lost Orphaned Valued Exceptional Dogs Program. Specifically, Petitioner was disciplined for feeding his dog human food, when he allowed an inmate in the chow hall to give the dog human food. In the disciplinary proceeding following this incident, Petitioner asserts he was treated

more harshly than a white sex-offender participant in the program who had admitted to assaulting Petitioner in a September 2018 incident. The second disciplinary proceeding arose from a confidential allegation that Petitioner had made threats against other inmates; Petitioner asserts the second proceeding was an outgrowth of the racial animus that motivated the first proceeding. As a result of the second disciplinary proceeding, Petitioner was transferred for several months to other facilities. Apparently in the process, DOC confiscated or lost some of Petitioner's personal property, and Petitioner seeks its return or restitution, among other forms of relief.

## DISCUSSION

### I.   *Jurisdictional Issue*

As a preliminary matter, Respondent raises a jurisdictional issue. Petitioner brought his claims using the Court's form for a § 2241 habeas petition and paid the $5 filing fee. He seeks several forms of relief – expungement of disciplinary convictions; restitution of personal property lost or impounded; reinstatement to his former positions in the L.O.V.E.D. dog program, housing and job; damages and punitive damages. Petitioner further requested to be transferred back to the Conservation Camp. This request is moot because he has in fact already been retransferred there.

Section 2241 provides habeas corpus relief as to the execution of a sentence in certain circumstances. *Montez v. McKenna,* 208 F.3d 862, 865 (10th Cir. 2000) Specifically, § 2241 provides habeas relief to prisoners who are "in custody in violation of the Constitution or laws … of the United States ...." 28 U.S.C. § 2241(c)(3). "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that

custody, and … the traditional function of the writ is to *secure release* from illegal custody." *Preiser v. Rodriguez,* 411 U.S. 475, 484 (1973) (emphasis added).

The habeas writ also encompasses requests to "attack future confinement and obtain future releases." *Id.* "[T]he federal habeas corpus statute does not deny the federal courts power to fashion appropriate relief other than immediate release. Since 1874, the habeas corpus statute has directed the courts to determine the facts and dispose of the case summarily, as law and justice require." *Id.* (internal quotation marks omitted). Thus, habeas proceedings are the correct vehicle for "a prisoner who challenges the fact or duration of his confinement and seeks immediate release or a shortened period of confinement." *Palma-Salazar v. Davis,* 677 F.3d 1031, 1035 (10th Cir. 2012).

Restitution, damages and punitive damages are not available in habeas proceedings. *Preiser,* 411 U.S. at 494 (damages are available only in civil rights actions); *Davis v. Fox,* 701 F. App'x 715, 716 (10th Cir. 2017) (claim for retaliatory impoundment of personal property cannot be brought in habeas petition). The Court clearly cannot hear Petitioner's requests for those types of relief on a habeas petition.

As for Petitioner's request to be reinstated to his former positions within the Conservation Camp, "[t]hough the Supreme Court has not set the precise boundaries of habeas actions, it has distinguished between habeas actions and those challenging conditions of confinement." *Palma-Salazar,* 677 F.3d at 1035 (internal quotation marks omitted). In the Tenth Circuit, claims regarding conditions of confinement cannot be brought by habeas petition even if the only relief sought is injunctive (transfers, reinstatements); this type of claim must instead be brought in a civil action. *See, e.g.,*

*Stouffer v. Carpenter,* 782 F. App'x 706, 708 (10th Cir. 2019) ("It is well-settled law that

prisoners who wish to challenge only the conditions of their confinement ... must do so

through civil rights lawsuits ... not through federal habeas proceedings," citing *Standifer v.*

*Ledezma,* 653 F. 3d 1276, 1280 (10th Cir. 2011)). In *Palma-Salazar,* the habeas petitioner

sought only a transfer to a lower-security facility; the Tenth Circuit held his claims

regarded conditions of confinement and affirmed dismissal without prejudice. 677 F.3d at

1033. *See also Buhl v. Berkebile,* 597 F. App'x 958, 959 (10th Cir. 2014) (affirming

dismissal without prejudice of habeas petition seeking transfer from special housing unit

to general prison population). Accordingly, the Court cannot hear Petitioner's requests for

reinstatement to his former positions on a habeas petition.

This leaves Petitioner's request for expungement of the two disciplinary convictions

at issue. Respondent recognizes this part of the petition is arguably appropriate for a habeas

petition but argues Petitioner's indeterminate sentence (28 years to life, doc. 24-1) means

that his petition cannot result in an earlier release.[1] Under Wyoming law, persons with an

indeterminate life sentence (and were over 18 years of age at the time of the offense, as

Petitioner was) are ineligible for parole. Wyo. Stat. § 7-13-402(a) ("The board may grant

a parole to any person imprisoned … under sentence, except a sentence of life

imprisonment without parole or a life sentence"); Doc. 24-12 (Wyoming Parole Board

Policy and Procedure Manual), p. 3 ¶ II.B. Petitioner can obtain release only by

---

[1] Based on accrued good time credits that are apparently not at issue, Petitioner has served his
minimum twenty-eight years. Doc. 24-13. In his response, Petitioner contends he is not on a "life"
sentence, based on drawing a distinction between life and "during life." Petitioner's contention is
insufficient to raise a material fact dispute; the state court judgment is conclusive on this issue.

commutation or pardon. *See, e.g.,* Wyo. Stat. § 6-10-301(c); *Bird v. Wyoming Bd. of Parole,* 2016 WY 100, ¶ 14, 382 P.3d 56, 64 (Wyo. 2016).

Requests for pardon are discretionary to the Governor. Wyo. Const. Art. 3 § 53. Requests for commutation are likewise discretionary, first with the Parole Board and then with the Governor. Wyo. Stat. § 7-13-401(f); Wyo. Const. Art. 4, § 5. An inmate's disciplinary record is one of many factors considered on a commutation request. If Petitioner's two disciplinary convictions at issue were expunged, this would result in a more favorable position for requesting commutation, but it would not entitle him to commutation.[2] Therefore, Respondent argues, the Court does not have jurisdiction to hear his habeas petition because success would not "necessarily spell speedier release," citing *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005).

Petitioner opposes this argument, arguing that if Respondent were correct, DOC could violate the constitutional rights of inmates with life sentences with impunity. However, Petitioner does not address why a civil action under 42 U.S.C. § 1983 would not provide an avenue for at least some of the relief he requests.

To date, the Supreme Court has been more concerned to limit the scope of § 1983 and *Bivens* civil actions vis-a-vis habeas relief, not the scope of habeas petitions. Both *Preiser* and *Wilkinson* address whether § 1983 was an appropriate vehicle for the prisoners' claims in question. *Preiser* left open whether habeas and § 1983 could overlap:

---

[2] Petitioner also asserts the alleged equal protection violations caused him (among other things) to be in restricted housing at the time of his commutation hearing, causing him to have to appear for the hearing in full restraints. Petitioner claims that appearing in full restraints significantly contributed to the panel's denial of his request to recommend commutation.

> [A] § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody. * * * *This is not to say that habeas corpus may not also be available to challenge such prison conditions.* … When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal.

*Preiser*, 411 U.S. at 499 (emphasis added). In that case, the Supreme Court declined to "explore the appropriate limits of habeas corpus as an alternative remedy to a proper action under § 1983." *Id.* at 500. More recently, at least for claims that assert "large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners," the Supreme Court has "left open the question whether they might be able to challenge their confinement conditions via a petition for a writ of habeas corpus." *Ziglar v. Abbasi,* –U.S.–,137 S. Ct. 1843, 1862–63 (2017) (citing *Preiser* and *Bell v. Wolfish,* 441 U.S. 520, 526 n. 6 (1979)). In *Ziglar,* illegal aliens alleged the Department of Justice adopted a policy shortly after the September 11 terrorist attacks to detain aliens based on their race, religion or national origin and to subject them to harsh conditions and physical abuse for a punitive purpose. In writing for a four-justice majority,[3] Justice Kennedy assumed without deciding that the habeas remedy would have been available for these prisoners to seek transfers to "less-restrictive conditions." *Ziglar,* 137 S. Ct. at 1863.

Here, Petitioner's allegations are nothing like the large-scale policy decisions alleged in *Ziglar,* and it appears the Tenth Circuit has not taken *Ziglar* as an invitation to revisit the scope of habeas jurisdiction. The Court therefore decides the jurisdictional issue

---

[3] Two justices dissented in *Ziglar* and three took no part in the case.

regarding Petitioner's request for expungement under the current state of the law in the Tenth Circuit. In *Griffin v. Samu,* 65 F. App'x 659 (10th Cir. 2003), a state prisoner sought expungement of a disciplinary conviction, where expungement would result in reinstatement of good time credits, but those credits would only affect parole eligibility, not his eventual date of discharge. The Tenth Circuit declined to reach whether such a claim should be brought pursuant to § 1983 or instead by habeas. *Id.* at 660 n.1, 661. In *Buhl v. Hood,* 81 F. App'x 273 (10th Cir. 2003), the Tenth Circuit

> recognize[d] that the line demarking actions appropriately brought under *Bivens* [civil rights actions] and those falling under § 2241 is not always crystal clear. … we have held that a § 2241 attack on the execution of a sentence may challenge the loss of good time credits and *other prison disciplinary matters.*

*Id.* at 274 (internal quotation marks and citations omitted, emphasis added).

However, more recently the Tenth Circuit held a "petition address[ing a prisoner's] placement in the SMU and loss of phone and email privileges," which did "not allege he should be immediately released or that any prison official has impermissibly increased the duration of his sentence," and sought "only the expungement of the incident from his record and a return to general population," could not be brought by a § 2241 petition. *Lawrence v. Oliver,* 602 F. App'x 684, 687–88 (10th Cir. 2015).

Here, much like in *Lawrence*, Petitioner does not allege expungement of the disciplinary convictions would entitle him to immediate or earlier release. Although if Petitioner were successful on his claims he would be in a more favorable position for his next commutation request, by *Wilkinson's* reasoning, this is not enough to recognize his claim for expungement on a habeas petition.

> Success for Dotson [one of the plaintiffs who brought a civil action] …
> means at most new eligibility review, which at most will speed *consideration*
> of a new parole application. Success for Johnson [the other plaintiff] means
> at most a new parole hearing at which [the] … authorities may, in their
> discretion, decline to shorten his prison term. … Because neither prisoner's
> claim would necessarily spell speedier release, neither lies at "the core of
> habeas corpus."

*Wilkinson*, 544 U.S. at 82. Given the traditional purpose of habeas petitions, the Tenth

Circuit's most recent holding on this issue in *Lawrence*, and the reasoning in *Wilkinson,*

the Court finds it lacks jurisdiction to hear Petitioner's request for expungement of the

disciplinary convictions on his habeas petition.

The next question is whether the Court should liberally construe the petition as

having instead been brought as a 42 U.S.C. § 1983 action. Petitioner did not expressly

request such treatment, but he did oppose Respondent's jurisdictional argument as

permitting Respondent to violate constitutional rights with impunity.

Because Petitioner is *pro se*, the Court construes his filings liberally. *Erickson v.*

*Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Garza v. Davis*, 596 F.3d 1198, 1201 n.2

(10th Cir. 2010). Liberal construction means that if the Court "can reasonably read the

pleadings to state a valid claim on which the plaintiff could prevail, [the court] should do

so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal

theories, … or his unfamiliarity with pleading requirements." *Hall v. Bellmon,* 935 F.2d

1106, 1110 (10th Cir. 1991). But the Court cannot act as an advocate for the pro se litigant.

*Id.* "[T]he court cannot take on the responsibility of serving as the litigant's attorney in

constructing arguments and searching the record." *Garrett v. Selby Connor Maddux &*

*Janer,* 425 F.3d 836, 840 (10th Cir. 2005).

Since the question is whether to construe Petitioner's habeas petition as a § 1983 complaint, not vice versa, there is no concern of prejudicing Petitioner's ability to bring a second habeas petition without the circuit court's leave. It is not clear whether the Tenth Circuit has yet addressed a case in which a district court recharacterized a habeas petition as a § 1983 complaint.[4] When faced with this situation, the Northern District of Oklahoma concluded it should not do so, in part because

> Petitioner would be required to pay the difference between the $350.00 filing fee for civil rights cases and the $5.00 filing fee for habeas cases—a difference of $345.00. *See Jones v. Wilner*, 2008 WL 4758549, at *1 (D. Colo. Oct. 24, 2008) (construing habeas petition as civil rights action and requiring inmate to immediately pay the balance of the filing fee, or to file a motion and affidavit for leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915 and make monthly payments in accordance with § 1915(b)(2) until the filing fee was paid in full). Construing this habeas Petition as a complaint seeking relief under 42 U.S.C. § 1983 could be a significant burden on Petitioner.

*Lamar v. Whitten,* No. CIV-19-358-PRW, 2019 WL 5406568, at *2 (W.D. Okla. July 12, 2019), *report and rec. adopted,* 2019 WL 5399542 (W.D. Okla. Oct. 22, 2019). The filing fee for complaints has increased to $400, so Petitioner would be required to either pay $395 immediately or a motion and affidavit to proceed in forma pauperis, and then make monthly

---

[4] The Tenth Circuit has at times condoned recharacterizing a § 1983 complaint as a habeas petition, but in each case the claims failed under either theory. *See, e.g., MacNeil v. Woodford,* 132 F.3d 43 (10th Cir. 1997) (construing pleading as both a § 1983 action and habeas petition); *Kailey v. Ritter,* 500 F. App'x 766, 769–70 (10th Cir. 2012) ("[t]he district court could liberally construe [a pro se] complaint as a section 2254 petition," citing *Smith v. Maschner,* 899 F.2d 940, 951 (10th Cir. 1990)). On the other hand, where a prisoner's § 1983 pleading did not request an earlier release, the Tenth Circuit deemed construing the complaint as arising under both § 1983 and § 2254 would "border[] on advocacy." *Richards v. Bellmon,* 941 F.2d 1015, 1019 n.3 (10th Cir. 1991).

payments until the fee is paid in full. As in *Lamar*, the Court finds this could be a significant burden to impose on Petitioner.

The *Lamar* court also concluded it should not recharacterize the habeas petition as a § 1983 complaint due to futility because the court concluded petitioner's allegations would not state a claim. *Id.,* 2019 WL 5406568, at *2. Here too, the Court finds recharacterizing Petitioner's habeas petition as a § 1983 complaint would be futile, and on this basis as well, the Court will not construe the petition as a § 1983 action.

II.    *Even if Construed as Brought Under 42 U.S.C. § 1983, Petitioner's Remaining Claims Would Not Survive Summary Judgment*

Construing the petition's equal protection claims as though brought in a § 1983 complaint would be futile because these claims would not survive Respondent's summary judgment motion. Although futility of a potential claim is more frequently addressed before discovery, Petitioner has had the opportunity to conduct discovery. As noted above, both parties filed their materials to expand the record. Consistent with the Court's scheduling order, Respondent has also filed his second motion for summary judgment. It is therefore appropriate to consider futility in this instance by examining whether Petitioner's claims would survive summary judgment. *Cf., Coleman v. Utah State Charter Sch. Bd.,* 673 F. App'x 822, 826–27 (10th Cir. 2016) ("An amendment is futile if the amended complaint would be subject to dismissal for any reason, including summary judgment.").[5]

---

[5] The First Summary Judgment Order set forth the standards for summary judgment. It should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "In order to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them." *Requena v. Roberts,* 893 F.3d 1195, 1210 (10th Cir. 2018), *cert. denied,* 139 S. Ct. 800 (2019). "Individuals are 'similarly situated' only if they are alike 'in all relevant respects.'" *Id.* (quoting *Coal. for Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008)).

The second element Petitioner must show for his claim of discrimination based on his Hispanic race is that Respondent acted with "racially discriminatory intent or purpose." *Villanueva v. Carere,* 85 F.3d 481, 485 (10th Cir. 1996). "The discriminatory purpose need not be the only purpose, but it must be a 'motivating factor in the decision.'" *Id.* (quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265–266 (1977)). Discriminatory purpose "implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse

---

affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he nonmoving party must support its contention that a genuine dispute of material fact exists either by (1) citing to particular materials in the record, or (2) showing that the materials cited by the moving party do not establish the absence of a genuine dispute." *Tolman v. Stryker Corp.*, 108 F. Supp. 3d 1160, 1162–63 (D. Wyo. 2015), *aff'd,* 640 F. App'x 818 (10th Cir. 2016) (citing *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). *See also* Fed. R. Civ. P. 56(c)(1)(A)–(B). "[W]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party, without making credibility determinations or weighing the evidence." *Roberts v. Jackson Hole Mountain Resort Corp.,* 884 F.3d 967, 971 n.3 (10th Cir. 2018) (quotation marks omitted).

effects upon an identifiable group." *United States v. Jackson,* No. 16-CR-2362-WJ, 2018 WL 6602226, at *5 (D.N.M. Dec. 17, 2018) (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985)). Petitioner's claims based on his non-sex offense status are instead subject to a rational basis test, under which Petitioner must "allege facts sufficient to establish 'the distinction between himself and other inmates was not reasonably related to some legitimate penological purpose.'" *Harrison v. Morton,* 490 F. App'x 988, 994 (10th Cir. 2012) (citing *Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir. 1996); *Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994)).

A.  *Petitioner's Equal Protection Claim Regarding the Disciplinary Proceeding for Feeding his Dog Human Food*

Regarding Petitioner's first disciplinary charge and conviction for an infraction of the dog program rules (by feeding his dog human food), Petitioner claims this was harsher treatment than similarly-situated white sex-offenders received, who had fed their dogs human food and were not charged with disciplinary violations. Respondent has expanded the record on this issue with affidavits of Audra Dudzinski (doc. 24-4) and Karen Powers (doc. 24-5), who are both officers in the L.O.V.E.D. dog program, and the affidavit of Warden Todd Martin (doc. 24-2). These affidavits state that with respect to Petitioner, he had a history of rule infractions in the L.O.V.E.D. dog program prior to the events he alleges, and that history necessitated escalating his discipline when it was reported that Petitioner obtained human food for his dog in early October 2018.

In his response, Petitioner disagrees with the affidavits' descriptions of his history in the program, which he summarizes as claiming he was "detrimental to the Project

L.O.V.E.D program," and believes his Parole Board hearings of July 2016, July 2017, July 2018, and October 2018 will show differently. Doc. 34, pp. 2-3, 7.[6] However, Petitioner's disagreement with the movant's affidavits, without pointing to specific facts in the record in support, does not suffice to show a material fact dispute for surviving summary judgment. The only documentation from the parole board in the record is the panel's denial of his request to recommend commutation, dated October 17, 2018. Doc. 14-3 (Respondent's Ex. Q). The document does not discuss anything presented in the hearing or the panel's rationale.

Petitioner also submitted a CD of materials reflecting his contributions to the L.O.V.E.D. program. The materials reflect Petitioner has a genuine passion and commitment to the dogs, their training, and making a positive contribution through the dogs to the people who ultimately receive them. The officers' affidavits assert Petitioner had violated program rules, but they do not seem to question Petitioner's passion for training the dogs in the L.O.V.E.D. program.

However, the material issue for purposes of Petitioner's equal protection claim is whether he was similarly situated with the white sex-offenders who he asserts received more favorable treatment. Petitioner does not dispute the officers' assertions that at the time of the events in September and October 2018, he already had a history of program

---

[6] Elsewhere, Petitioner asserts he can only request a commutation recommendation every five years. Doc. 34, p. 12. It is unclear to the Court whether Petitioner's annual Parole Board hearings regard some other form of request, but this question does not appear material to Petitioner's claims.

rule infractions.[7] The rule infractions had led to his being removed from the program for a time. After he was reinstated, he violated another program rule and was suspended for 3 months. Petitioner does not point to any facts in the record establishing that the more favorably treated white, sex-offender participants in the L.O.V.E.D. program had a similar history in the program when they fed their dogs human food. Petitioner argues his prior discipline history was also discriminatory, in that two or perhaps three other dog handlers (M. Adkins, Nelson, Ken Eely) broke the dog program rules or DOC policies outside of the program and were not disciplined. Doc. 34, pp. 8, 13-14. These assertions are conclusory. Petitioner does not identify dates, the inmates' offender status (sex offender or not), or their disciplinary histories at the time of the rule violations for which they were not removed from the dog program or the honor dorm.

Petitioner also does not point to facts rebutting the affidavits' assertions that when the officers learned of other participants feeding their dogs human food, they gave informal warnings to not do so. Nor does Petitioner address Dudzinski's assertion that they investigated Petitioner's allegation that Mr. Gifford's dog, Gator, had his own bag in the chow hall for human food and found no evidence of it. These facts undercut Petitioner's

---

[7] Petitioner asserts that as to one of the two early 2018 incidents in the officers' affidavits, when he put his hands on a growling dog and pushed it down, he "was found to have done nothing wrong." Doc. 34, p. 11. However, (a) Petitioner did not cite any documentation on that point, and (b) Officers Dudzinski and Powers do not actually assert he was disciplined for this incident. Rather, they assert the conduct was "contrary to the discipline taught in the program," doc. 24-4, and "could have injured the … dog." Doc. 24-5. The apparent dispute of whether Petitioner violated program rules or not in that instance is not material. The Court assumes Petitioner was not disciplined for that incident, either because he was shown leniency or because there was no violation. The Court also notes that in the early 2018 incident for which he was disciplined (for allowing rough-housing with his dog), after filing a grievance, Petitioner received the same discipline that he asserted white dog handlers had received. Doc. 24-6.

assertion that he was singled out as the only dog handler whose conduct led to investigation. In short, because on the expanded record Petitioner does not show the white and/or non-sex offender dog handlers who were not disciplined for essentially the same conduct were similarly situated to him, the claim would fail on Respondent's summary judgment motion. Construing Petitioner's equal protection claim regarding the first disciplinary conviction as though it were brought under § 1983 would be futile.

B.    *Petitioner's Equal Protection Claim Regarding the Disciplinary Proceeding for MJ-24 Threats*

Regarding Petitioner's second disciplinary charge and conviction for making threats, Petitioner claims he received harsher treatment based on his Hispanic race and non-sex offender status compared to Frank Gifford, a white sex-offender in the L.O.V.E.D. program. Petitioner asserts Gifford admitted to punching Petitioner when the two sought to separate fighting dogs in September 2018. Petitioner also asserts Gifford threatened him during the incident, yet he did not receive a disciplinary conviction for either punching or threatening him. Petitioner in contrast received a transfer to a higher security facility for several months and was removed from the dog program, etc.

In expanding the record, Respondent filed several documents relating to the September 2018 incident between Petitioner and Gifford. These include investigation reports on Petitioner's complaint regarding that incident, the investigating officer's audiorecorded interviews of Petitioner, Gifford and a witness (Mr. Trujillo), an affidavit from the investigating officer regarding his investigation of the incident, Petitioner's letter to the director of DOC, and the deputy administrator's response thereto. Doc. 24-7, 24-8,

24-9, and 24-10 (exhibits G, H, I, J); CD submitted with Doc. 24 containing Ex. T (Gifford interview); CD submitted with Doc. 25 containing Ex. A (Petitioner interview of September 3, 2018), and Ex. C (interview of D. Trujillo, September 3, 2018).[8]

These materials assert: Gifford did not admit to assaulting Petitioner; rather, he said he put his hands up, palms out, to prevent Petitioner from running into him in the process of trying to separate Gator from the other dog.  Mr. Trujillo did not see Gifford swing at Petitioner and characterized his contact with Petitioner as more of a push or a throat-chop, not a punch; Petitioner said in his interview with the investigating officer (Lieutenant Scott) on September 3, 2018 that he did not remember whether Gifford's hand was open or closed, just felt some grazing of his jaw, and rated the pain at 1 out of 10.  When asked why he called the contact a punch, Petitioner said that's what Officer Powers told him after viewing the security camera footage.[9]  Officer Powers was not present during the incident; Petitioner and Trujillo reported the incident to her, and she was the charging officer against Gifford.  The nurse found no bruising or other sign of injury.  The investigating officer later viewed apparently the same video as inconclusive on the nature of Gifford's contact with Petitioner. Doc. 24-7 (Ex. G), p. 6.

---

[8] Respondent also submitted a video file of security camera footage of the incident with Mr. Gifford (Ex. B on CD submitted with Doc. 25), but it is in a proprietary N3R file format.  The Court could not open the video file.

[9] In her staff report and conduct violation report on this incident, Officer Powers stated Barela reported to her that Gifford hit him "under his chin on the right side," Gifford admitted he "struck" Barela, and the video "verified the reports of" Petitioner and Trujillo.  Doc. 24-9, pp. 6, 12.  Officer Powers later reported that on viewing the video, it "appeared Gifford had come into contact with Barela."  Doc. 24-5 (affidavit of November 15, 2019).

Regarding Gifford's threats to Petitioner, in his interview with Lieutenant Scott, Petitioner did not express a concern that Gifford would attempt to follow through. Petitioner said there was no continuing issue with Gifford. Trujillo did not take Gifford's talk seriously, characterizing it to the effect of Gifford was just being a grumpy person generally.[10] In the end, based on all the reports from the investigation, the hearing officer (Colt Peterson) dismissed the disciplinary charge against Gifford for lack of evidence.

In response, Petitioner does not point to any facts in the record that rebut these assertions.[11] Petitioner asserts the audiorecordings and staff reports support the assault against him (doc. 34, p. 4), but those materials instead reflect that other than Officer Powers' initial reaction to the video, no one but Petitioner and Officer Powers asserted Gifford did more than defensively push or shove Petitioner in the chest or neck during the dog fight. Gifford said he pushed Petitioner to prevent him from running into him; Trujillo said he did not see anything other than Gifford's hand in contact with Petitioner's neck; in the investigating officer's view, the video did not show the nature of the contact. More importantly, the audiorecordings and staff reports uniformly reflect Petitioner had no injury. Assault causing physical injury was a required element for the disciplinary charge against Gifford. Doc. 24-7, p. 6.

---

[10] Both parties also filed materials relating to Petitioner's grievance(s) earlier in 2018, alleging several inmates had made threats to him that staff did not investigate. Without deciding whether these documents show exhaustion of administrative remedies, Petitioner does not point to any facts that would support the inmates in question were white, non-sex offenders, or that they were all similarly-situated to him.

[11] Petitioner asks (doc. 34, p. 3) for an opportunity to refute the allegations in Respondent's second summary judgment motion, but his response to that motion was his opportunity to do so.

Respondent also filed several documents relating to the October 2018 investigation of Petitioner's alleged threats and the disciplinary conviction on the MJ-24 charge, including an unredacted[12] copy of Lieutenant Scott's investigation report summarizing the confidential informants' statements, audiorecordings of the investigatory interviews with Petitioner on October 11 and 12, 2018, and an audiorecording of the October 15, 2018 disciplinary hearing.

In the First Summary Judgment Order, the Court noted the record was unclear whether Petitioner had pled guilty or not in this hearing. The October 15 audiorecording reflects Petitioner was at first confused about the need to request a plea bargain if he wanted to do so, before pleading guilty. However, once Petitioner asked for the charge to be reduced or deferred, the hearing officer (Sergeant Peterson) understood Petitioner was confused and cleared this up. The panel disregarded Petitioner's guilty plea and allowed him to request a plea bargain – down from the major infraction 24 (threat) to a general infraction 19 (insulting behavior, etc.). The hearing panel considered this request and denied it. Peterson then explained to Petitioner that they were returning to the same point where he'd been confused earlier. Peterson asked Petitioner how he pled to the MJ-24, and Petitioner said guilty. *See* Respondent's Ex. D (CD filed with Doc. 25) at approximately 18:50 and again at 19:29. Petitioner pled guilty to the MJ-24 charge for making threats.

---

[12] Petitioner notes he has not received the unredacted report. This is because the Court granted Respondent's motion to submit the unredacted report only under seal for the Court's in camera review, due to the security concern that inmates who gave confidential statements in the investigation should not have their identities disclosed to the inmate who was the subject of the investigation. Petitioner received the redacted report, and for purposes of his claims, the three informants' identities appear to be irrelevant.

Petitioner does not point to any facts in the record to support he was similarly situated with Gifford as to the second disciplinary conviction. Gifford did not plead guilty to the disciplinary charge of minor assault; rather, the hearing officer dismissed it for lack of evidence, as discussed above. Petitioner argues the investigating officer, Lieutenant Scott, has been inconsistent in his affidavits regarding the number of confidential informants that reported hearing Petitioner make threats. At this phase, the Court cannot determine credibility of witnesses and is to construe the evidence in the light most favorable to Petitioner. However, Petitioner does not show a genuine issue of material fact on this issue. The investigation report reflects Lieutenant Scott heard from three informants – the same number of inmates that he mentioned as reporting the threat in his October 12, 2018 interview of Petitioner. The report reflects that one of the three did not hear the threat directly, but only heard from another inmate that they had heard Petitioner say it. Lieutenant Scott's references at time to two informants is consistent with discounting the hearsay informant for purposes of charging Petitioner.

Petitioner also argues that the caseworker (Ms. Townsend) on the hearing panel for the MJ-24 charge should not have been on the panel according to DOC policies. However, on the expanded record, Petitioner does not point to any facts supporting this procedural irregularity was racially motivated. *I.e.,* Petitioner does not point to facts suggesting Respondent included Ms. Townsend on the hearing panel at least in part to treat Petitioner more harshly because he is Hispanic.

Petitioner further argues Ms. Townsend's affidavit has discrepancies in asserting the first report of Petitioner's threats occurred when an inmate told her on October 10,

2018[13] that Barela was "becoming more erratic due to not getting parole" and that Petitioner intended to do what it takes to be sent to the Wyoming State Penitentiary if his hearing did not go well, including to take out the females in C-Dorm. Doc. 24-14. Ms. Townsend further states she submitted a staff report on this assertion, and Lieutenant Scott followed up on it with her. Petitioner points out this alleged conversation was a week before his commutation hearing, so he could not have yet been erratic about not receiving parole, and therefore Petitioner disbelieves that this conversation ever took place. Again, the Court cannot resolve credibility issues on summary judgment, but even in the light most favorable to Petitioner, the inmate's alleged assertion to Ms. Townsend is consistent with Petitioner having had unsuccessful parole board hearings in July 2016, July 2017, and July 2018, and his next such hearing coming up soon on October 17, 2018.

In short, Petitioner does not point to facts suggesting white, non-sex offenders were similarly situated and received more favorable treatment than he did, having pled guilty to the MJ-24 charge. Accordingly, the equal protection claim as to this disciplinary proceeding likewise would not survive summary judgment, and thus construing it as though brought under § 1983 would be futile.

---

[13] In his response, Petitioner misreads Ms. Townsend's affidavit as asserting this conversation took place on October 8, 2018. Ms. Townsend asserts it occurred on October 10, the same day that Petitioner was placed in restricted housing for the investigation. Lieutenant Scott's investigation report reflects he received Ms. Townsend's staff report on the morning of October 11, 2018, in which Ms. Townsend stated the conversation was on October 10. Doc. 24-18 (redacted copy).

The petition seeks "[r]estitution for all of my Property taken or lost," though it does not allege any facts regarding the property that was allegedly taken or lost.  Given how little Petitioner alleged for this claim, it is unsurprising that Respondent's briefs do not appear to address it directly.  However, in his expansion of the record, Petitioner provides several documents relating to this claim.  Doc. 23, pp. 43-57.  Assuming without deciding it was proper to provide the fact allegations in the expansion of the record, it would be futile for the Court to construe the claim as though it had been brought under § 1983.  First, the only legal theories Petitioner has presented are for due process and equal protection violations in the disciplinary proceedings, not in Respondent's losing or confiscating his personal and religious property.  He has not pled any legal theory regarding his property.  In his response to the second summary judgment motion, Petitioner claims this was "[r]etaliatory action for the Petitioner standing-up for his rights," but he provides no factual or legal argument or authorities in support.  The Court cannot act as Petitioner's advocate.

Second, even assuming Petitioner's mere reference to retaliation is sufficient to state a legal theory for how his constitutional rights were violated, the documents that Petitioner submitted would support finding his claim was not administratively exhausted when he brought it, as required for a prisoner's § 1983 claims.  42 U.S.C. § 1997e(a); *Jones v. Bock,* 549 U.S. 199, 202 (2007).  Almost all of the documents that Petitioner submits post-date the petition in this case.  In addition, the letters from Warden Pacheco and the director of DOC reference Petitioner failed to give a required written response regarding the property within a 30-day time period.  Petitioner did not include any documentation to show he complied

with that requirement, or that he complied with the grievance procedures regarding his lost or confiscated property more generally. If the Court were to construe the claim for restitution as brought under § 1983, it would not survive summary judgment.

## CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART Respondent's second motion for summary judgment, Doc. 25. The motion is GRANTED to the extent it argues a lack of jurisdiction over Petitioner's claims, and is DENIED to the extent it seeks dismissal with prejudice. When the Court lacks jurisdiction, it must instead dismiss without prejudice. Accordingly,

IT IS FURTHER ORDERED that Barela's Petition (Doc. 1) is DISMISSED WITHOUT PREJUDICE.

Dated this 31st day of January, 2020.

_____
NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE